EVERT ASJES, JR., KATHRYN ASJES, EVERT ASJES III, ANNE ASJES, HUGH D. ASJES, AND JUDITH M. ASJES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8561–77.    Filed August 7, 1980.

*Robert I. Donnellan* and *Danny R. Carpenter,* for the petitioners.

*Larry K. Akins,* for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in

petitioners' Federal income tax for the taxable year 1973 as follows:

| Petitioner | Deficiency |
|---|---|
| Evert Asjes, Jr., and Kathryn Asjes | $68,707.23 |
| Evert Asjes III and Anne Asjes | 13,906.15 |
| Hugh D. Asjes and Judith M. Asjes | 10,752.60 |

Concessions having been made, the issues which remain for decision are:

(1) Whether, for purposes of section 1033,[1] a lump-sum condemnation award must be allocated to various types of property condemned;

(2) Whether, if allocation of a lump-sum condemnation award is required, petitioners' wholly owned corporation properly reinvested the proceeds qualifying them for nonrecognition of gain;

(3) Whether, if gain must be recognized, it will be taxable to petitioners as ordinary income or capital gain.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners are the sole shareholders of Rosehill Gardens, Inc. They resided in or around Kansas City, Mo., at the time the petition herein was filed. They filed joint income tax returns for the year 1973 with the Internal Revenue Service in Kansas City, Mo. Kathryn, Anne, and Judith Asjes are parties to this proceeding solely due to their having filed joint income tax returns with their husbands, Evert, Jr., Evert III, and Hugh D. Asjes, respectively.

Petitioners own and operate Rosehill Gardens, Inc., a nursery business located in Jackson County, Mo. The business was begun by Evert Asjes, Sr., in 1914 as a sole proprietorship. Evert Asjes, Jr., worked in this family business from the late 1920's until 1952, when it incorporated as Rosehill Gardens, Inc. (Rosehill), and he became its president. From 1952 until 1973, Rosehill was located on 72 acres of property at 116th Street, Kansas City, Mo. (hereinafter sometimes referred to as the 116th Street property). In the years at issue, Evert Asjes, Jr., was president and

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable year in issue.

majority shareholder of Rosehill, which has been taxed as a small business corporation. See sec. 1371 et seq. Rosehill's nursery business involves the propagation, growth, purchase, and sale of various trees, shrubs, and plants (hereinafter referred to as nursery stock). The bulk of nursery stock owned by Rosehill is grown by it from seeds, grafts, and cuttings. This operation involves a long process of planting, transplanting, and moving nursery stock through various technologically equipped greenhouses located on the property until it is capable of survival in the fields. There, protection from sun and strong southwesterly winds is afforded young nursery stock, until salable, by large trees and plants, called windbreaks, which are essential to their survival.

In December 1968, Jackson County, Mo., acting through its park department (hereinafter referred to as the county), notified Evert Asjes, Jr., that the 116th Street property would be required for a proposed park. It offered to purchase the land and improvements for $183,000, and the vegetation growing thereon for an additional $69,305. Despite more than 2½ years of negotiations and numerous appraisals of the various components of the 116th Street property ranging to over $400,000, the parties could not agree on a value. The county then filed a condemnation action in August 1972. An independent court-appointed commission found that the damage sustained by Rosehill as a result of the condemnation of the 116th Street property, including the land, improvements, windbreaks, and the growing, but not yet salable, nursery stock, was $389,000. In addition to the land and nursery stock and windbreaks growing thereon, the following improvements were condemned by the county:

| | |
|---|---|
| Nine polygreenhouses | Pole barn |
| Fiberglass propagating house | Concrete docks |
| Tenant house | Two water wells |
| Storage building | High-pressure water system |
| Welding shop | Sprinkler system |
| Pumphouse | Gas well |
| Foreman's office | Roads and walkways |
| Steel barn | Fifty-six unheated, |
| Lathe house | covered plant frames |

All nursery stock, both purchased and self-grown, which was movable, was removed by Rosehill prior to condemnation, and

thus, not included in the condemnation award. The award was stated as a lump sum, without any indication as to how the commissioners arrived at that figure. That is to say, there was no allocation of the award between land, buildings, and vegetation. The commissioners' report provided in pertinent part:

> That part of the Northwest quarter of the Southeast quarter of Section 9, Township 47, Range 33, in Kansas City, Jackson County, Missouri, that lies West of Blue River Road.
>
> That part of the North sixty acres of the East half of the Northwest quarter of Section 9, Township 47, Range 33, that lies East and North of the center line of the Big Blue River; and that part of the West half of the Northwest quarter of Section 9, Township 47, Range 33, in Kansas City, Jackson County, Missouri, that lies East and North of the center line of the Big Blue River and West of Blue River Road.
>
> We, the Commissioner[s], assess the net damages by reason of the appropriation of the above described ground at the sum of $389,000.00.

In June 1973, $389,000 was paid to Rosehill, at which time, title to the 116th Street property vested in the county. Rosehill's net condemnation award, after adding reimbursement for miscellaneous expenses and deducting legal fees and $14,000 paid by Rosehill in settlement of further action by the county, was $368,921.42. Rosehill's net realized gain on condemnation was $213,784.42. Within the permissible period provided by statute under section 1033(a)(3)(B),[2] plus an extension granted by the District Director of Internal Revenue, Rosehill expended $372,220.10 for 100 acres of land and improvements to be used in the business as replacement for property condemned by the county. Specifically, the following property was purchased by Rosehill on the dates set forth:

| Date purchased | Description of property | Cost |
|---|---|---|
| March 1973 | Polygreenhouse.................... | $6,663.90 |
| March 1973 | Polygreenhouse.................... | 2,062.46 |
| May 1973 | 100 acres of land and vegetation ........................ | 161,263.25 |
| July 1973 | Propagation greenhouse........ | 38,969.46 |
| September 1973 | Polygreenhouse.................... | 3,840.00 |
| September 1974 | Improvements to propagation greenhouse ........................ | 10,490.09 |

---

[2] Sec. 1033(a)(3)(B) was redesignated sec. 1033(a)(2)(B) by Pub. L. 94–455, sec. 1901(a)(128(A)), effective for taxable years beginning after Dec. 31, 1976.

| September 1974 | Building ........................... $138,875.94 |
| August 1976 | Two polygreenhouses............ 10,055.00 |
| Total................................................ | 372,220.10 |

The land purchased by Rosehill was located in nearby Belton, Mo. (Belton property). It had significant natural windbreaks worth approximately $80,000 and salable vegetation valued at about $20,000.

On its 1973 tax return, Rosehill reported the condemnation award, electing not to recognize gain pursuant to section 1033. Petitioners have not reported any undistributed taxable income from the condemnation. Instead, they have treated the purchase of replacement property as qualifying the entire condemnation award for nonrecognition under section 1033(a)(3)(A).

Respondent has determined, based primarily on precondemnation negotiations, that the net award attributable to the condemned nursery stock was $188,124.50, and that due to Rosehill's alleged failure to replace the nursery stock, this amount should be taxed to petitioners as ordinary income.

## OPINION

Petitioners maintain that the entire net condemnation award of $368,921.42 is not capable of being allocated because it was paid only for the involuntarily converted real estate. Further, that having reinvested over $372,000 in land and improvements as replacement property, all of the gain realized on condemnation qualifies for nonrecognition under section 1033(a)(3)(A).[3]

---

[3]SEC. 1033. INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

\*        \*        \*        \*        \*        \*        \*

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

(A) NONRECOGNITION OF GAIN.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at

Respondent, however, argues that the award is severable into three components—land, improvements, and vegetation, and that only land and improvements were timely replaced. Thus, respondent maintains that all of the net gain realized on condemnation of the vegetation should be recognized. Respondent values such gain at $188,124.50. Finally, respondent contends that since the vegetation was held by Rosehill for sale in the ordinary course of its business, and since all of the costs to grow and maintain the trees and plants were deducted from ordinary income, the entire gain recognized is ordinary income.

Rosehill is taxed as a small business corporation. Sec. 1371 et seq. As such, the characterization for Rosehill of the condemnation as a taxable or a nonrecognition transaction will be determinative as to whether petitioners have recognized income on the condemnation as undistributed taxable income under section 1373.

The issue to which we must first address ourselves is whether, under the circumstances of the instant case, the condemnation award should be allocated to the various components of the involuntarily converted property. This Court has repeatedly held that where a lump-sum condemnation award consists entirely of compensation for *property* taken, the award may not be allocated among the various items of property involved. See, e.g., *Kendall v. Commissioner*, 31 T.C. 549 (1958); *Bymaster v. Commissioner*, 20 T.C. 649 (1953); *Allaben v. Commissioner*, 35 B.T.A. 327 (1937). See also *Lapham v. Commissioner*, 178 F.2d 994 (2d Cir. 1950). Compare *Graphic Press, Inc. v. Commissioner*, 60 T.C. 674 (1973), revd. 523 F.2d 585 (9th Cir. 1975). The rule has been stated that:

a lump sum purchase price is not to be rationalized after the event of sale as representing a combination of factors which might have been separately stated in the contract if the parties had been [seen] fit to do so. * * * [*Bymaster v. Commissioner, supra* at 653–654.]

An exception exists, however, if the condemnation award represents compensation for nonproperty items, such as interest or a waiver of legal rights. This would be evidenced by an award significantly in excess of the value of the property taken. Under

such time and in such manner as the Secretary or his delegate may by regulations prescribe. * * *

these circumstances, allocation to these nonproperty items is appropriate. See *Graphic Press, Inc. v. Commissioner*, 523 F.2d 585 (9th Cir. 1975), revg. on other grounds 60 T.C. 674 (1973); *Smith v. Commissioner*, 59 T.C. 107 (1972).[4] In *Graphic Press, Inc. v. Commissioner, supra* at 588, the Court of Appeals noted that "The award is separable *only* if the taxpayer was compensated for losses *other than* the condemned property." (Emphasis supplied.) In light of this authority, we cannot accept respondent's contention that a rule allowing allocation of lump-sum condemnation proceeds is appropriate in all cases. In *Graphic Press, Inc. v. Commissioner, supra*, the Ninth Circuit reversed this Court on whether a waiver of a right to have property condemned was in fact property. The rules set forth above, however, were left largely undisturbed.

The pivotal question, therefore, relates to the classification of the vegetation growing on Rosehill's 116th Street tract as an item of property or as a nonproperty interest. Ordinarily, trees and shrubbery are part of the land upon which they grow. This is the case under Missouri law—that until trees are severed from the land, they are part and parcel of it. See *Cooley v. Kansas City, P. & G.R. Co.*, 149 Mo. 487, 493, 51 S.W. 101, 103 (1899); *Stagner v. Staples*, 427 S.W.2d 763, 765 (Mo. App. 1968). We do not consider it critical that many of Rosehill's trees and shrubs which were condemned were ultimately to be sold to customers. At the time of the taking, they were not of a salable size. More importantly, perhaps, is the fact that in many instances, it would have been years before they were ready for sale. It is thus the opinion of this Court that the trees and shrubbery growing on Rosehill's 116th Street property were part of the real estate and, therefore, no allocation of the award is permitted.

The Internal Revenue Code also endorses an identical result. Rosehill was in the business of farming, and its products—trees and shrubs—must be considered crops. There is no question that under Federal tax law a nursery operation comes under the heading of a farm. *Stokes v. Commissioner*, 22 T.C. 415, 425 (1954). Although not all farm products are crops, e.g., chickens on a poultry farm or cattle on a dairy farm (*United States v. Chemell*, 243 F.2d 944 (5th Cir. 1957)), we cannot agree with

---

[4] See also *Estate of Walter v. Commissioner*, T.C. Memo. 1971–244 (1971).

respondent that crops are "products from annual plants such as cereals, fruits and vegetables and the like, but not nursery stock, because nursery stock is not intended to be harvested on an annual basis."

Rosehill's operation included planting, cultivating, fertilizing, watering, and finally, harvesting the nursery stock—the same process used in producing edible crops such as wheat and corn. We find no logical reason to conclude that only edible vegetation harvested on an annual basis can be considered crops. Respondent cites cases from five States which support his view, however, there are at least as many States which adhere to a contrary position, including Missouri, where Rosehill's farming operation was conducted. See *Kansas City v. Rosehill Gardens, Inc.*, 542 S.W.2d 776 (Mo. 1976). Congress has also indicated that nursery stock is a growing crop. See sec. 352, Revenue Act of 1978, Pub. L. 95–600, 95 Stat. 2779, 1978–3 C.B. (Part 1) 80–81.[5] See generally H. Rept. 95–1445, 115–117 (1978), 1978–3 C.B. (Vol. 1) 181. For the foregoing reasons, we hold that nursery stock comes within the definition of a "growing crop."

Congress has seen fit to grant special relief in the case of growing crops when sold or taken through involuntary conversion with the land. Sec. 1231.[6] Section 1231(b)(4) provides that

---

[5]SEC. 352. ACCOUNTING FOR GROWING CROPS.

(a) APPLICATION OF SECTION.—This section shall apply to a taxpayer who—

(1) is a farmer, nurseryman, or florist,

(2) is on an accrual method of accounting, and

(3) is not required by section 447 of the Internal Revenue Code of 1954 to capitalize preproductive period expenses.

\* \* \* \* \* \* \*

(e) GROWING CROPS.—For purposes of this section, the term "growing crops" does not include trees grown for lumber, pulp, or other nonlife purposes.

[6]Sec. 1231 provides in pertinent part:

SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. \* \* \*

\* \* \* \* \* \* \*

under certain circumstances, a crop will be treated as "property used in the trade or business." Conversely, in such instances, crops will not be treated as "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." See sec. 1231(b)(1)(B). Crops, if not considered held for sale must, by virtue of the fact that they are growing on the land, be part of the land. The Internal Revenue Service has determined that the exclusion of crops from the classification "stock in trade" applies equally to like kind exchanges of real property under section 1031(a): [7]

> Inasmuch as section 1231(b)(4) of the Code provides that unharvested crops sold or exchanged with land are considered property used in trade or business, the parenthetical exclusion of section 1031(a) of the Code (stock in trade or other property held primarily for sale) does not apply. * * * [Rev. Rul. 59–229, 1959–2 C.B. 180, 181.]

The reasoning behind section 1231(b)(4) was that it would not be appropriate to treat a sale of crops under extraordinary circumstances in the same manner as sales in the ordinary course of business. Congress has stated that (S. Rept. 781, 82d Cong., 1st Sess. 47 (1951)) "sales [and involuntary conversions] of land together with growing crops or fruit are not such transactions as occur in the ordinary course of business and should thus result in capital gains rather than in ordinary income."

We accept the Service's application of this rule to section 1031

---

(b) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.— * * *

(1) GENERAL RULE.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not—

\* \* \* \* \* \* \*

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

\* \* \* \* \* \* \*

(4) UNHARVESTED CROP.—In the case of an unharvested crop on land used in the trade or business and held for more than 6 months, if the crop and the land are sold or exchanged (or compulsorily or involuntarily converted) at the same time and to the same person, the crop shall be considered as "property used in the trade or business."

[7]SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE INVESTMENT.

(a) NONRECOGNITION OF GAIN OR LOSS FROM EXCHANGES SOLELY IN KIND.—No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidence of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

given the extraordinary nature of exchanges there made. Clearly, the crop is not being exchanged in the ordinary course of business. It is being exchanged as part of the land. This being the case, we hold that this analysis applies equally to the provisions of section 1033 in light of its purpose as a relief provision. Section 1033(g)[8] contains an exclusion from its terms of property held "primarily for sale" in the ordinary course of business. Thus, we find that when unharvested crops are involuntarily converted with the land, the parenthetical exclusion of section 1033(g) does not apply. Since 1231(b)(4) envisions special relief where crops are sold or involuntarily converted with the land, and gain is recognized,[9] it seems appropriate to apply similar relief under identical circumstances where recognition of gain will be postponed under section 1033. Thus, Rosehill's nursery stock, as a crop, growing on the land, was part of the condemned real estate. Rosehill's lump-sum condemnation award, therefore, may not be allocated among improvements, land, and vegetation.

Finally, we note that section 1033 requires a broad construction to effectuate its purposes. See *Loco Realty Co. v. Commissioner*, 306 F.2d 207 (8th Cir. 1962). In *Loco Realty Co. v. Commissioner, supra* at 215, the Court of Appeals agreed with this Court that section 1033 "was not intended to penalize but to protect persons whose property may be taken on condemnation, * * * and, * * * that this statute embraces relief provisions and is to be construed liberally in order to effectuate its purposes." See also *Washington Railway & Electric Co. v. Commissioner*, 40 B.T.A. 1249, 1257 (1939). If we were to deny nonrecognition treatment under the facts herein by considering the trees and shrubs stock in trade, and separate from the land, or by refusing to exempt unharvested crops from the parenthetical of section

---

[8]SEC. 1033(g). Condemnation of Real Property Held for Productive Use in Trade or Business or for Investment.—

(1) Special rule.—For purposes of subsection (a), if real property (not including stock in trade or other property held primarily for sale) held for productive use in trade or business or for investment is (as the result of its seizure, requisition, or condemnation, or threat or imminence thereof) compulsorily or involuntarily converted, property of a like kind to be held either for productive use in trade or business or for investment shall be treated as property similar or related in service or use to the property so converted.

[9]It is clear from this discussion that contrary to respondent's position, any gain which would have been recognized in connection with the condemnation of Rosehill's nursery stock would not be ordinary income but would instead be capital gain under sec. 1231(b)(4).

1033(g), we would render it nearly impossible for taxpayers ever to qualify for nonrecognition on condemnation. We cannot apply a rule which would so blatantly obstruct the purposes of section 1033.

The remaining question is whether Rosehill's purchase of the Belton property and the improvements placed thereon qualify for nonrecognition, as replacement property, under section 1033(a)(3)(A). The 116th Street property taken from Rosehill in condemnation consisted of land, greenhouses, buildings and other related improvements, windbreaks, and nursery stock. The Belton property purchased by Rosehill as replacement property consisted of land, windbreaks, and salable vegetation. Additionally, Rosehill placed buildings and other improvements thereon.

The standard which replacement property must meet to qualify for nonrecognition treatment is that it be of a "like kind" to the property condemned. Sec. 1033(g); sec. 1.1033(g)–1(a), Income Tax Regs. We find that Rosehill has met this test. The theory of nonrecognition of gain or loss on exchange or condemnation is that when one ends up with like kind property, he remains in the same position he had prior to the disposition. "[I]f the taxpayer's money is still tied up in the same kind of property as that in which it was originally invested, he is not allowed to compute and deduct his theoretical loss on the exchange, nor is he charged with a tax upon his profit." H. Rept. 704, 73d Cong., 2d Sess. (1934), 1939–1 C.B. (Part 2) 554, 564. The words "like kind" in section 1031(a) refer to the "nature or character of the property and not to its grade or quality." Sec. 1.1031(a)–1(b), Income Tax Regs. The regulations go on to note that an exchange of city real estate for a farm or ranch, or improved real estate for unimproved real estate by one not a dealer therein qualifies for nonrecognition. See sec. 1.1031(a)–1(c), Income Tax Regs.

We cannot agree with respondent that Rosehill has substantially altered the nature of its property. In condemnation of its 116th Street property, Rosehill gave up land with vegetation, buildings, and improvements, and that is what it repurchased. The Belton property, with its improvements, is not identical to the 116th Street property. No two tracts of real estate are ever identical. Respondent agrees that precision in identity of replacement property is not required—a proposition well supported by this Court. *Koch v. Commissioner*, 71 T.C. 54, 65 (1978):

the standard for comparison, section 1031(a) refers to property of a like—not an identical—kind. The comparison should be directed to ascertaining whether the taxpayer, in making the exchange, has used his property to acquire a new kind of asset or has merely exchanged it for an asset of like nature or character.

Since Rosehill's condemned property and its replacement property are the same kind of assets, having the same nature and character, we find that the like kind test of section 1033(g) has been met.

Based on the foregoing discussion, we hold that petitioners' entire gain realized on the condemnation qualifies for nonrecognition under section 1033(a)(3)(A).

Because of concessions,

*Decision will be entered under Rule 155.*